IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                          Criminal No.:  ELH-17-322

MICHAEL JOHNSON
*Defendant*.

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a motion for compassionate release filed by defendant

Michael Johnson, who is serving a 102-month sentence for a drug offense, dating to November 2,

2017.  *See* ECF 375; ECF 215 at 1.  In the motion, initially filed by Johnson, pro se, he claims that

his underlying medical conditions, coupled with the COVID-19 pandemic, constitute an

extraordinary and compelling reason for his compassionate release, pursuant to 18 U.S.C. §

3582(c)(1)(A).  *See* ECF 375 at 2. Johnson also submitted two exhibits.   *See* ECF 375-1; ECF

375-2.[1]

The government's opposition is docketed at ECF 416 (the "Opposition").  And, it filed six

exhibits in support of the Opposition. *See* ECF 416-1 to ECF 416-6.

Thereafter, defendant, through counsel, filed another motion and a memorandum of law

for compassionate release.  *See* ECF 419.  He also submitted numerous exhibits, docketed

collectively at ECF 420.  I shall refer to ECF 375 and ECF 419 collectively as the "Motion."  The

government did not respond to ECF 419.

---

[1] Before Johnson obtained counsel, the Office of the Public Defender declined to represent
him. *See* ECF 379.  But, it provided the Court with records pertaining to defendant's medical
conditions and the exhaustion of Johnson's administrative remedies.  *See* ECF 381.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion, in part.

## I. Background

Johnson was one of eleven people charged in a Superseding Indictment filed on September 6, 2017. *See* ECF 21. In a Second Superseding Indictment followed (ECF 111), Johnson was charged in Count One with conspiracy to distribute and possess with intent to distribute a mixture containing heroin and fentanyl, in violation of 21 U.S.C. § 846. On June 20, 2018, pursuant to a plea agreement (ECF 190, the "Plea Agreement") entered under FED. R. CRIM. P. 11(c)(1)(C), defendant tendered a guilty plea to Count One of the Second Superseding Indictment. ECF 189.

The Plea Agreement included a stipulated statement of facts. *Id.* at 9-10. According to the stipulation, from 2016 to 2017, investigators with the Drug Enforcement Administration and the Baltimore Police Department investigated ongoing drug-trafficking activity in Baltimore and elsewhere. *Id.* at 9. Johnson was "identified as a member of a drug distribution conspiracy whose members purchased narcotics from suppliers in Mexico, arranged for the importation of the narcotics into the United States, and distributed the narcotics in the Baltimore area." *Id.*

The investigation uncovered evidence that established "Johnson's membership and participation in the conspiracy," including "physical surveillance of [Johnson's] activities and the activities of his co-conspirators; wiretaps during which a co-conspirator and his accomplices were monitored while planning and discussing drug transactions over cellular phones, including text messages and voice calls; [and] drug seizures from various locations . . . ." *Id.* And, Johnson admitted that he conspired "to distribute 1 kilogram or more of heroin and 400 grams or more of fentanyl in Maryland and elsewhere." *Id.*

According to the stipulation, Johnson's role in the conspiracy "included traveling to Mexico in order to meet with the conspiracy's suppliers in that country, and to ingest narcotics provided by the supplier in order to test the narcotics prior to purchase by the conspiracy." *Id.* As provided in the Plea Agreement, in February 2017, investigators intercepted several of Johnson's communications in which he, among other things, "advised a co-conspirator of [his] status during a trip to Mexico and sought financial assistance from a co-conspirator to help [him] return to the United States from Mexico"; "discussed his own interactions with the Mexican narcotics supplier"; "advised a co-conspirator . . . that another shipment of drugs . . . was being sent from Mexico, as well as numbers indicating how large the shipment would be." *Id.* Investigators ascertained that "another member of the conspiracy had rented a storage unit in the name of Johnson and used that storage unit to store narcotics," and Johnson "relayed" information to a coconspirator about the unit. *Id.*

In April 2017, "Johnson and a co-conspirator arranged for Johnson to travel to Mexico" with a female companion. *Id.* On April 5, 2017, "law enforcement surveillance teams actually observed Johnson and the female engaged in various portions of the trip, including leaving Baltimore from Baltimore Washington International Airport; arriving in California; traveling on to Mexico; arriving in a Mexican city; and traveling within that Mexican city to a residence." *Id.* Defendant returned to the United States on April 23, 2017. *Id.*

In the Plea Agreement, the parties agreed that defendant had a base offense level of 32, pursuant to § 2D1.1(c)(1) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). ECF 191, ⁋ 6. And, if defendant were found to be a career offender, the Plea Agreement provided that the base offense level would remain 32. *Id.* Thus, after three deductions for acceptance of responsibility, the parties contemplated a final offense level of 29. *Id.*

There was no agreement as to defendant's criminal history or his criminal history category. *Id.* ¶ 7. And, the Plea Agreement did not include an agreed upon sentencing range. Instead, the government agreed to "recommend a sentence based on the factors set forth in 18 U.S.C. § 3553(a)." *Id.* ¶ 9.

The Presentence Investigation Report (ECF 215, the "PSR") reflected that defendant, born in 1960, had an extensive criminal history that spanned 36 years and included 28 adult criminal convictions. *Id.* ¶¶ 32-59. However, many of these convictions did not score points. *See, e.g.*, *id.* ¶¶ 32, 33 34, 43, 44, 48, 50, 52. Nonetheless, defendant had 22 criminal history points. *Id.* ¶ 62. And, Johnson qualified as a career offender, pursuant to U.S.S.G. § 4B1.1(a). *Id.* ¶ 26. Whether as a career offender or based on his criminal history score, defendant had a criminal history category of VI. *Id.* ¶¶ 62, 63.

Of import here, defendant had three prior convictions for distribution of heroin or attempted distribution of heroin as well as one conviction for attempted distribution of cocaine. *See id.* ¶¶ 53, 55, 58, 59. In particular, on April 16, 2007, defendant was found guilty of one count of attempt to distribute heroin. *Id.* ¶ 53. He was sentenced to time served. *Id.* About seven months later, Johnson was convicted of one count of attempted distribution of heroin. *Id.* ¶ 55. He was sentenced to three years' incarceration, with all but one day suspended, as well as two years of probation. *Id.* Then, on May 9, 2008, defendant was found guilty of violating the terms of his probation and sentenced to two years' imprisonment. *Id.* After defendant's release, he was found to have violated his parole. *Id.*

On May 26, 2011, defendant was convicted of distributing heroin and sentenced to twelve years' imprisonment, nearly all of which was suspended, and three years of supervised probation. *Id.* ¶ 58. But, on August 9, 2012, Johnson was found guilty of violating his probation. *Id.* His

4

probation was continued.  *Id.*  Soon thereafter, on March 29, 2013, he was again found to have violated his probation.  *Id.*  He was sentenced to a one-year term of incarceration.  *Id.*

Johnson was also convicted on November 3, 2015, of one count of attempted distribution of cocaine.  *Id.* ¶ 59.  He was sentenced to four years' incarceration, with all but time served suspended, and a three-year term of supervised probation.  *Id.*  At the time the PSR was filed, an upcoming hearing was scheduled concerning defendant's violation of probation.  *Id.*

Sentencing in this case was held on September 28, 2018.  ECF 248.  Johnson was 58 years old at the time.  ECF 215 at 2.  Based on a final offense level of 29 and a criminal history category of VI, the Guidelines called for a period of imprisonment ranging from 151 to 188 months.  ECF 250 at 1.

In defendant's sentencing memorandum, Johnson contended that "a lengthy period of incarceration would be greater than necessary to comply with the purposes of the law."  ECF 239 at 4.  He also moved for a "variance from the guideline range established by the U.S. Sentencing Commission," (*id.* at 10), contending that a criminal history category of VI overstated his criminal history.  *See id* at 14-33.  The United States opposed that request, arguing that, if anything, the assigned criminal history category of VI understated defendant's history.  ECF 241 at 6-7.  And, the government recommended a sentence of ten years' imprisonment.  *Id.* at 1, 5, 8.

The PSR indicated that Johnson's parents had both passed away, defendant has never been married, and he has no children.  ECF 215, ¶ 94, 96.  But, he had five siblings, four of whom were alive.  *Id.* ¶ 95.  According to the PSR, Johnson lived with his thirty-five-year-old niece and her three children.  *Id.* ¶ 97.

Johnson attended school through ninth grade and then attended Woodstock Job Corps Center in 1977, "where he participated in a carpentry program, but he did not complete it." *Id.* ⁋ 107. Defendant earned his GED in 2000. *Id.* ⁋ 108.

Defendant was diagnosed with HIV in 1995. *Id.* ⁋ 102. He believes that he contracted the disease as a result of intravenous drug use. *Id.* Johnson reported that he was prescribed three medications for the condition. *Id.*

Between 1983 and the day of his arrest in November 2017, defendant used heroin on a daily basis. *Id.* ⁋ 105. Johnson's criminal record reflects that he was ordered to participate in a treatment program at Gaudenzia in 2006. *See id.* ⁋⁋ 51, 105. In addition, defendant advised that he participated in a methadone program through the University of Maryland in 2017, "which he said he found helpful." *Id.* ⁋ 106.

The court imposed a sentence of 102 months' imprisonment. ECF 249 at 2; ECF 250 at 2.[2] That was well below the Guidelines range of 151 to 188 months and well below the 120 months sought by the government. In imposing the sentence, I considered defendant's age and his struggles with drug addiction, among other things. *Id.* at 3. An Amended Judgment and corresponding Statement of Reasons were filed on October 18, 2018, pursuant to Fed. R. Crim. P. 36. See ECF 257; ECF 258.[3]

BOP records reflect that Johnson is currently serving his sentence at Fort Dix FCI. ECF 420 a 73; *see Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last

---

[2] I did not impose a fine, and therefore I need not address defendant's request that the Court "waive the imposition of a fine, pursuant to Guidelines section 5E1.2(e)." ECF 419 at 11.

[3] The Judgment incorrectly noted that the date on which defendant's offense concluded was the day that the Judgment was issued. *See* ECF 249. The Amended Judgment accurately reflects that the instant offense concluded on June 30, 2017. *See* ECF 257.

visited Nov. 22, 2021).[4]  Including credit for the roughly 10 months that defendant spent in pretrial detention (*see* ECF 420 at 99), he has served slightly more than 48 months of his 102-month sentence, or approximately 47%.  He has a projected release date of January 28, 2025.  *See Find an Inmate*, *supra*.

According to defendant, if the Motion is granted, he will resume living with his niece in Pikesville, Maryland.  ECF 419 at 3; ECF 420 at 104.  And, Johnson advises that, upon release, he will look for light duty work.  To that end, he indicates that he will renew his driver's license and test for a commercial driver's license.  ECF 420 at 104.  He also reports that he plans to attend Narcotics Anonymous meetings as well as a support meeting for those living with HIV or AIDS. *Id.* at 105.

Records attached to the Motion reflect that Johnson completed a "Reduction in Sentence Application" on May 15, 2020 (*see* ECF 375-2 at 1), which was denied.  *See id.* at 2.  Defendant then submitted a request for compassionate release to the Warden of Coleman FCI on June 17, 2020.  *Id.* at 3.  That request was also denied.  *Id.* at 4.  As the government notes, "defendant has exhausted the administrative   requirements associated with a First Step Act sentencing reduction request."  ECF 416 at 2.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v.*

---

[4] At the time of filing the Motion, defendant was incarcerated at Coleman FCI.  ECF 375 at 2.  He was transferred to Fort Dix FCI on January 14, 2021.  ECF 420 at 73.

*United States*, 564 U.S. 522, 526 (2011).   One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.   Section 3582 was adopted as part of the Sentencing Reform Act of 1984.   Originally, a court was permitted to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.   The BOP rarely filed motions on an inmate's behalf.   As a result, compassionate release was exceedingly rare.   *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).   As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility,"

whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)   **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I)  suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where

10

the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228,

230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

To be sure, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16,

2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *United States v. High*, 997 F.3d 181, 187 (4th Cir. 2021) (internal quotation marks omitted).

### III.  COVID-19[5]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6] Defendant filed his motion for compassionate release in February 2021.  At that time, as now, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis. This is because, the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of November 22, 2021, COVID-19 has infected more than 47 million Americans and caused approximately 771,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 22, 2021).

Although this country saw a reduction of COVID-19 cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months"). Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

14

But, in recent weeks, the trend has again become more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").  Even so, health authorities warn that there remain reasons for caution, including the relatively low levels of vaccination in parts of the country, as well as an expected increase in the number of indoor gatherings, where the virus can more easily spread, due to the encroachment of colder weather and the impending holiday season.  *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19 to reflect the most available data, most recently in October of 2021.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL &

PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY. [hereinafter *Certain Medical Conditions*]. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), bronchiectasis, bronchopulmonary dysplasia (chronic lung disease affecting newborns), interstitial lung disease, cystic fibrosis, and pulmonary embolism; pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV; being immunocompromised; liver disease; mood disorders, including depression and schizophrenia spectrum disorder; obesity, with a body mass index ("BMI") of 25 or higher; pregnancy; sickle cell disease or thalassemia; smoking (current or former); solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and, tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, the CDC cautions that the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not

made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health,

School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has

since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 69% of all persons twelve years of age and older is fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 22, 2021).  And, 59% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/              federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.

As of November 22, 2021, the BOP reported that 105 inmates out of a total 134,198 federal inmates and 259 BOP staff out of some 36,000 staff members, tested positive for COVID-19; 42,290 inmates and 8,434 staff have recovered from the virus; and 267 inmates and seven staff members have died from the virus.  Moreover, the BOP has administered 254,455 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 22, 2021).

With respect to Fort Dix FCI where defendant is imprisoned, the BOP reported that as of November 22, 2021, out of a 3,213 total of inmates, zero have tested positive.  And, six staff members have test positive for COVID-19, and 1,622 inmates and 101 staff have recovered at the facility.  In addition, 2,077 inmates, as well as 276 staff members, have been fully inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Fort Dix*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/ftd (last visited Nov. 22, 2021).  And, "BOP has administered to the defendant both doses of the COVID-19 vaccine . . . ."  ECF 416 at 5; *see* ECF 416-4.

## IV. Discussion

### A.

Johnson argues that the Court should grant the Motion because his underlying health conditions render him particularly vulnerable to COVID-19 and thus constitute an extraordinary and compelling reason that warrants his release from prison.  ECF 375 at 2-3.  Defendant submitted over 90 pages of medical records with the Motion, which confirm that defendant suffers from, *inter alia*, HIV and Hepatitis C.  *See e.g.*, ECF 420 at 5, 39, 67, 73, 83.  With the Opposition, the government also provided copies of Johnson's medical records.  *See* ECF 416-2; ECF 416-3.  As the government recognizes, Johnson has also shown "some indications of hypertension."  ECF 416 at 3 (citing ECF 416-2 at 8, 10).

Defendant asserts that his HIV status renders him immunocompromised, as evidenced by his low CD4 count.  ECF 419 at 1-2; *see* ECF 420 at 14 (showing defendant's latest CD4 count was 204); *What are CD4 Cells?*, CNTRS. FOR DISEASE CONTROL, https://www.cdc.gov/hiv/pdf/effective-interventions/treat/steps-to-care/my-stc/cdc-hiv-stc-what-are-cd4-cells.pdf, (last accessed Nov. 14, 2021) (explaining that a healthy adult typically has a

CD4 count in the range of 500 and 1,600).[8]  And, as earlier explained, the CDC considers HIV, Hepatitis C, and hypertension to be conditions that "can make you more likely to get severely ill from COVID-19."  *See Certain Medical Conditions*, *supra*.  Furthermore, the CDC cautions that "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in an individual."  *Id.*  And, the CDC warns that "[o]lder adults are more likely to get severely ill from COVID-19."  *Id.*

The government concedes that Johnson "does have some health conditions that appear on the CDC list."  ECF 416 at 3.  But, the government notes that "defendant's HIV status is asymptomatic and he has not contracted any HIV-related illnesses."  ECF 416 at 3; *see* ECF 416-3 at 8, 35; ECF 420 at 16.

In any event, the government argues that defendant's health conditions no longer merit his compassionate release because of the measures the BOP has taken to protect inmates and staff from COVID-19.  ECF 416 at 4.  And, the government points out that defendant has been fully vaccinated against COVID-19.  *Id.* at 4-5.  As the BOP records submitted with the Opposition show, defendant received his second dose of the COVID-19 vaccine on April 13, 2021.  *See* ECF 416-4 at 1.  Defendant acknowledges his vaccination status but nonetheless contends that "vaccines do not guarantee protection."  ECF 419 at 6.

To be sure, the COVID-19 vaccines effectively reduce the health risks posed by the coronavirus.  Defendant's COVID-19 vaccination reduces his risk of severe illness if he were to again contract COVID-19.  But, in my view, defendant's vaccination status "does not negate that his underlying health conditions make him eligible for compassionate release."  *United States v.*

---

[8] According to the CDC, "CD4 cells help your body fight infections" and a "CD4 count is the number of CD4 cells you have in your blood."  *HIV: Understanding Care*, CNTRS. FOR DISEASE CONTROL, May 20, 2021, https://www.cdc.gov/hiv/basics/livingwithhiv/understanding-care.html.

*Spriggs*, CCB-10-364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).   Indeed, recent developments make clear that the pandemic is continually evolving and ongoing.   For example, the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death.   *See Rates of COVID-19 Cases and Death by Vaccination Status*, CNTRS. FOR DISEASE CONTROL, Oct. 15, 2021, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status, (last accessed Nov. 14, 2021).

Moreover, the CDC has recommended that those who were previously considered to be fully vaccinated should now receive a booster shot of an authorized vaccine in order to maintain protection against COVID-19.   *See CDC Expands Eligibility for COVID-19 Booster Shots*, CNTRS. FOR DISEASE CONTROL, Oct. 21, 2021, https://www.cdc.gov/media/releases/2021/p1021-covid-booster.html, (last accessed Nov. 14, 2021).   But, the record does not reflect whether the BOP has administered a booster to defendant.

In light of the changing circumstances regarding COVID-19, coupled with defendant's multiple medical conditions, I conclude that Johnson's vaccination status does not render him ineligible for compassionate release.   *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. Jul. 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues.").

To the contrary, I am persuaded that defendant's health conditions qualify him for compassionate release.   *See United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Jenkins*, DKC-12-0043, 2021 WL 5140198, at *4-*5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based on

his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against COVID-19) .   However, this determination does not end the analysis.

### B.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).   Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).   The Court must also consider the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

In this case, I am not persuaded that the § 3553(a) factors militate in favor of Johnson's immediate release.   As the government notes, Johnson's crime of conviction was a serious one: he worked to arrange for the importation of dangerous narcotics from Mexico into the greater Baltimore area. *See* ECF 189 at 9-10.   On the other hand, and as the government concedes, Johnson was not a leader of the conspiracy and "was in fact being used . . . because he was a drug user and was therefore able to test the conspiracy's narcotics during his Mexican trips."   ECF 416 at 9.

The Court cannot overlook defendant's criminal history, which is a serious one.   That said, Johnson's prior convictions also reflect a longstanding struggle with drug addiction. *See* ECF 215,

¶¶ 32-59, 105.  And, despite defendant's numerous prior convictions, the longest continuous term of incarceration that he had previously served was twenty months.  *Id.* ¶¶ 46, 47, 48.  Johnson has already been incarcerated for more than twice as long as any of his prior periods of imprisonment.

Johnson's eight-and-a-half year sentence is greater than the sentences imposed upon all but three of his codefendants.  *See* ECF 419 at 12-13.[9]  But, of Johnson's codefendants who received a sentence less than 102 months, they all had either a lower final offense level, criminal history category, or both.  *See, e.g.*, ECF 260 (Judgment), ECF 261 (Statement of Reasons), *United States v. Church*, ELH-17-322-5 (D. Md. Oct. 19, 2018) (reflecting that defendant, who was sentenced to 46 months' imprisonment, had a criminal history category of IV and a final offense level of 19).  In fact, Johnson received a more lenient sentence than a codefendant who had the same total offense level and a lower criminal history category.  *See* ECF 305 (Statement of Reasons); ECF 304 (Judgment), *United States v. Harris*, ELH-17-322-3 (D. Md. Dec. 17, 2018).

Defendant's post-sentencing conduct weighs in his favor.  *See Pepper v. United States*, 562 U.S. 476, (2011) (noting that a defendant's post-sentencing conduct "provides the most up-to-date picture of his 'history and characteristics'") (quoting 18 U.S.C. § 3553(a)(1)).  Most notably, BOP records reflect that defendant has not received any disciplinary infractions while in federal custody.  *See* ECF 420 at 100.  Moreover, Johnson has dedicated his time in prison to his rehabilitation by engaging with vocational programming, such as a course on the process to attain a commercial driver's license, and by completing a Drug Abuse Education Course.  *See* ECF 420 at 101.  In addition, I am mindful that Johnson's imprisonment in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such

---

[9] The Motion incorrectly notes that Antoine Harris was sentenced to 140 months' imprisonment.  ECF 419 at 12.  Mr. Harris received a sentence of 114 months.  *See* ECF 304 (Judgment), *United States v. Harris*, ELH-17-322-3 (D. Md. Dec. 17, 2018).

that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

However, Johnson has only been incarcerated for slightly more than four years. That represents less than half of the sentence that the Court imposed. ECF 419 at 3; *see Kibble*, 992 F.3d at 332-33 (finding district court was entitled to consider amount of time defendant served and the nature of the offense as factors in the § 355(a) analysis). And, Johnson's criminal history gives the Court serious reason for concern. In my view, the time the defendant has served to date is not sufficient to assure the Court that defendant would not pose a risk to public safety if he were released now. But, in light of defendant's various medical conditions and his post-sentencing conduct, I am of the view that a reduction of Johnson's sentence is appropriate.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have found that a court "need not choose between immediate, unconditional release or no relief at all" and have, accordingly, granted sentence reductions that did not result in immediate release. *See, e.g.*, *United States v. Johnson*,

26

RDB-07-0153, 2020 WL 6063733, at *6 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, 461 F. Supp. 3d 343, 352 (W.D. Va. 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790, 807 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

Therefore, I conclude that a 24-month reduction in Johnson's sentence is appropriate. In my view, a sentence of 78 months is "sufficient, but not greater than necessary" to comply with the purposes of incarceration. *See* 18 U.S.C. § 3553(a).

## IV.  Conclusion

For the reasons elaborated above, I shall grant the Motion, in part. Johnson's sentence shall be reduced from 102 months to 78 months. The terms and conditions of supervised release to which Johnson was originally sentenced will remain in place.

An Order follows, consistent with this Memorandum Opinion.

Date: November 23, 2021                                   _____/s/_____

Ellen L. Hollander
United States District Judge